**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA; THE STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, VERMONT, WASHINGTON; THE COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA; AND THE DISTRICT OF COLUMBIA EX REL. TARIK AHMED,

Plaintiffs-Relator,

v.

PFIZER INC., TRIS PHARMA, INC., NEXTWAVE PHARMACEUTICALS, INC., AND KETAN MEHTA,

Defendants.

No. 18 Civ. 00870 (PGG)

# STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: Telephone: (212) 637-2795/2696
E-mail: Jeremy.Liss@usdoj.gov
Erica.Silverman@usdoj.gov

JEREMY M. LISS
ERICA SILVERMAN
Assistant United States Attorneys
– Of Counsel –

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

LEGAL BACKGROUND .........................................................................................................2

ARGUMENT ...........................................................................................................................6

I. Fraud on the FDA May Give Rise to False Claims Act Liability ..........................6

A. False Claims Act Liability Turns on the Causal Connection Between FDA Fraud and Government Payment ..........................................................6

B. Defendants' Authorities Do Not Establish a Categorical Bar to False Claims Act Liability for Fraud on the FDA ................................................8

II. cGMP Violations May Be Relevant to False Claims Act Liability When They Cause Material Product Defects ...............................................................12

III. The False Claims Act's *Qui Tam* Provisions Are Consistent With Article II ...........................................................................................................................15

A. Relators Need Not Be Appointed in the Manner Prescribed by the Appointments Clause ...............................................................................17

B. Qui Tam Suits Have Historically Been Viewed as Constitutionally Permissible and Do Not Violate the Vesting or Take Care Clauses ......................21

CONCLUSION .......................................................................................................................24

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Bowsher v. Synar*,
478 U.S. 714 (1986) ........ 23

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
587 U.S. 262 (2019) ........ 20

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n*,
601 U.S. 416 (2024) ........ 23

*Cook County v. United States ex rel. Chandler*,
538 U.S. 119 (2003) ........ 2

*Crocano v. Trividia Health Inc.*
615 F. Supp. 3d 1296–12 (S.D. Fla. 2022) ........ 14

*D'Agostino v. ev3, Inc.*,
845 F.3d 1 (1st Cir. 2016) ........ 8

*Deligdish v. N. Brevard Cnty. Hosp. Dist.*,
*No.* 6:22-cv-696 (JSS) (DCI), 2025 WL 2217710 (M.D. Fla. Aug. 5, 2025) ........ 15

*Hughes Aircraft Co. v. United States ex rel. Schumer*,
520 U.S. 939 (1997) ........ 19

*International Rehab. Scis. Inc. v.Sebelius*,
688 F.3d 994 (9th Cir. 2012) ........ 5

*Kenley Emergency Med. v. Schumacher Grp. of Louisiana Inc.*,
*No.* 20-cv-03274-SI, 2025 WL 1359065 (N.D. Cal. May 9, 2025) ........ 15

*Lucia v. SEC*,
585 U.S. 237 (2018) ........ 17

*Marsh v. Chambers*,
463 U.S. 783 (1983) ........ 22

*Marvin v. Trout*,
199 U.S. 212 (1905) ........ 21, 22

*Mikes v. Straus*,
274 F.3d 687 (2d Cir. 2001) ........ 13

*Morrison v. Olson*,
487 U.S. 654 (1988) .................... 17, 18

*Myers v. United States*,
272 U.S. 52–75 (1926) .................... 23

*Proctor v. Wound Care Mgmt., LLC*,
No. 18-4234, 2025 WL 2444133 (E.D. La. Aug. 25, 2025) .................... 15

*Riley v. St. Luke's Episcopal Hosp.*,
252 F.3d 749–58 (5th Cir. 2001) (en banc) .................... 14, 22

*Trump v. Cook*,
No. *25A312*, 2026 WL 1855613 (U.S. June 29, 2026) .................... 23

*Trump v. Slaughter*,
No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026) .................... 23

*United States ex rel. Adler v. Sporn Co. Inc.,*
*No. 2:24-cv-00617*, 2025 WL 1371272 (D. Vt. May 12, 2025) .................... 15

*United States ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*,
997 F. Supp. 2d 1272–79 (M.D. Fla. 2014) .................... 16

*United States ex rel. Butler v. Magellan Health Servs., Inc.*,
74 F. Supp. 2d 1201 (M.D. Fla. 1999) .................... 16

*United States ex rel. Butler v. Shikara*,
748 F. Supp. 3d 1277–97 (S.D. Fla. 2025) .................... 15, 22

*United States ex rel. Campie v. Gilead Scis., Inc.*,
862 F.3d 890 (9th Cir. 2017) .................... 7, 11, 12

*United States ex rel. CLJ, LLC v. Halickman,*
*No. 20-CV-80645*, 2024 WL 3332055 (S.D. Fla. June 14, 2024) .................... 16

*United States ex rel. Feldman v. City of New York*,
808 F. Supp. 2d 641 (S.D.N.Y. 2011) .................... 6-7, 11

*United States ex rel. Forcier v. Computer Sciences Corp.*,
2017 WL 3616665 (S.D.N.Y. Aug. 10, 2017) .................... 11

*United States ex rel. Gomez v. Koman Constr., LLC*,
796 F.Supp.3d 353 (W.D. Tex. Aug. 22, 2025) .................... 15

*United States ex rel. Gonite v. United Healthcare of Georgia, Inc.*,
785 F. Supp. 3d 1325, (M.D. Ga. 2025) .......... 15

*United States ex rel. Gose v. Native Am. Servs. Corp.*,
*No. 8:16-cv-03411*, 2025 WL 1531137 (M.D. Fla. May 29, 2025) .......... 16

*United States ex rel. Hendow v. University of Phoenix*,
461 F.3d 1166 (9th Cir. 2006) .......... 10

*United States ex rel. Kelly v. Boeing Co.*,
9 F.3d 743–59 (9th Cir. 1993) .......... 14-15

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
985 F.2d 1148 (2d Cir. 1993) .......... 16

*United States ex rel. Main v. Oakland City Univ.*,
426 F.3d 914 (7th Cir. 2005) .......... 7, 10, 11

*United States ex rel. Marcus v. Hess*,
317 U.S. 537 (1943) .......... *passim*

*United States ex rel. McCullough v. Anthem Ins. Cos., Inc.*,
*No. 1:21-cv-00325-TWP-TAB*, 2025 WL 2782576 (S.D. Ind. Sept. 30, 2025) .......... 15

*United States ex rel. Miller v. ManPow, LLC*,
No. 1:21-cv-5418 (VAP) (ADS), 2023 WL 8290402 (C.D. Cal. Aug. 30, 2023) .......... 16

*United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*,
865 F.3d 29 (1st Cir. 2017) .......... 8, 9

*United States ex rel. Penelow v. Janssen Prods., LP,*
*No. CV 12-7758* (ZNQ) (JBD), 2025 WL 937504 (D.N.J. Mar. 28, 2025) .......... 15-16

*United States ex rel. Petratos v. Genentech Inc.*,
855 F.3d 481 (3d Cir. 2017) .......... 7

*United States ex rel. Polansky v. Executive Health Resources, Inc.*,
599 U.S. 419 (2023) .......... 1, 19, 21

*United States ex rel. Powell v. Medtronic, Inc.,*
2024 WL 4165522 (S.D.N.Y. Sept. 12, 2024) .......... 13, 14

*United States ex rel. Publix Lit. P'ship, LLP,*
*No. 8:22-cv-2361-TPB-AAS*, 2025 WL 1381993 (M.D. Fla. May 13, 2025) .......... 15

*United States ex rel. Resolution NJ LLC v. Riverside Med. Grp., P.C.*,
*No. 2:22-cv-4165*, 2024 WL 4100372 (D.N.J. Sept. 6, 2024) .................................................... 16

*United States ex rel. Rostholder v. Omnicare, Inc.*,
745 F.3d 694 (4th Cir. 2014) ........................................................................................ 13

*United States ex rel. Schmidt v. Zimmer, Inc.*,
386 F.3d 235–45 (3d Cir. 2004) ........................................................................................ 6

*United States ex rel. Shahbabian v. Trihealth, Inc.*,
*No. 1:20-cv-67*, 2025 WL 2108197 (S.D. Ohio July 28, 2025) .................................................. 15

*United States ex rel. Souza v. Embrace Home Loans, Inc.*,
808 F. Supp. 3d 314 (D.R.I. 2025) ........................................................................................ 15

*United States ex rel. Stenson v. Radiology Ltd., LLC*,
*No. CV-19-00306-TUC-JGZ*, 2025 WL 1785266 (D. Ariz. June 27, 2025) .............................. 15

*United States ex rel. Stone v. Rockwell Int'l Corp.*,
282 F.3d 787–07 (10th Cir. 2002) ........................................................................................ 14

*United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
41 F.3d 1032–42 (6th Cir. 1994) .............................................................................. 14, 20

*United States ex rel. Taylor v. Healthcare Assocs. of Texas, LLC*,
*No. 3:19-CV-02486-N*, 2025 WL 1885642 (N.D. Tex. July 8, 2025) ....................................... 15

*United States ex rel. Thomas v. Mercy Care*,
2023 WL 7413669 (D. Ariz. Nov. 9, 2023) ........................................................................ 16

*United States ex rel. Travis v. Gilead Scis., Inc.*,
No. 17-1183, 2025 WL 2627686 (E.D. Pa. Sept. 11, 2025) ...................................................... 15

*United States ex rel. Wallace v. Exactech, Inc.*,
703 F. Supp. 3d 1356 (N.D. Ala. 2023) ................................................................................ 16

*United States ex rel. Yu v. Grifols USA, LLC*,
2021 WL 5827047 (S.D.N.Y. Dec. 8, 2021) ........................................................................ 9

*United States ex rel. Yu v. Grifols USA, LLC*,
2022 WL 7785044 (2d Cir. Oct. 14, 2022) ............................................................... 9, 10, 14

*United States ex rel. Zafirov v. Fla. Med. Assocs.,*
*LLC*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024) ................................................................ 16, 17, 18

*United States v. Donziger*,
38 F.4th 290 (2d Cir. 2022) .................... 18

*United States v. Germaine*,
99 U.S. 508 (1878) .................... 17

*United States v. Griswold*,
24 F. 361 (D. Or. 1885) .................... 19

*United States v. Marshall Medical Center*,
2015 WL 2235461 (E.D. Cal. May 12, 2015) .................... 12, 13

*United States v. Neifert-White Co.*,
390 U.S. 228 (1968) .................... 2

*United States v. Rahimi*,
602 U.S. 680 (2024) .................... 23

*United States v. Strock*,
982 F.3d 51 (2d Cir. 2020) .................... 11

*United States v. Weitzel*,
246 U.S. 533 (1918) .................... 17-18

*Universal Health Services., Inc. v. United States ex rel. Escobar*,
579 U.S. .................... 12, 13

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*,
529 U.S. 765 (2000) .................... 19, 22, 23

*Wisconsin v. Pelican Ins. Co.*,
127 U.S. 265 (1888) .................... 23

*Wood v. Siemens Medical Solutions USA, Inc.*,
No. 25-864, 2026 WL 504530 (2d Cir. Feb. 24, 2026) .................... 9

**Statutes**

21 U.S.C. § 334 .................... 4

21 U.S.C. § 351 .................... 4, 12

21 U.S.C. § 355 .................... 3, 4

21 U.S.C. §§ 332 .................... 4

31 U.S.C. § 3729 .................... 3

31 U.S.C. § 3730 ........ *passim*

38 U.S.C. § 7301 (b) ........ 4

38 U.S.C. § 8126 ........ 4

42 U.S.C. § 1395kk ........ 5

42 U.S.C. § 1395w-102 ........ 5

42 U.S.C. § 1396a ........ 5

42 U.S.C. § 1396r-8 ........ 5

**Other**

21 C.F.R. § 7.40 ........ 4

21 C.F.R. §§ 314.50 ........ 12

21 C.F.R. pts. 210–211 ........ 4

42 C.F.R. §§ 430.0, 431.10 ........ 5

42 C.F.R. §§ 447.45 ........ 5

CMS, Medicare Benefit Policy Manuel, ch. 15 § 50.4 ........ 5

Federal Rule of Civil Procedure 41 ........ 21

Federal Rule of Civil Procedure 9 ........ 9

U.S. Const. art. II, § 2, cl. 2 ........ 17

U.S. Const. art. II, §§ 1, 3 ........ 20

The United States of America, by its attorney, James M. McDonald, United States Attorney for the Southern District of New York, respectfully submits this Statement of Interest to address legal issues raised by Defendants' motions to dismiss. Although the United States declined to intervene, this action is brought in its name to redress an alleged injury to the Government, and the United States remains the real party in interest. *See United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 425, 430 (2023).

**PRELIMINARY STATEMENT**

This *qui tam* action concerns federal reimbursement for Quillivant XR, an FDA-approved prescription drug. Relator alleges that Defendants changed the drug's manufacturing and testing methods, concealed those changes and their consequences from the Food and Drug Administration ("FDA") and government payors, and caused federal healthcare programs to reimburse claims for a product that materially departed from the product that FDA had previously approved. Defendants dispute those allegations and seek dismissal. The United States addresses only certain legal questions that Defendants' motions raise; it takes no position on the truth of Relator's allegations or the sufficiency of the pleadings.

First, fraud on the FDA may give rise to False Claims Act liability when it foreseeably causes false or fraudulent claims for government payment. FDA approval is often a prerequisite for government healthcare programs to pay for a drug. Accordingly, False Claims Act liability may attach where a manufacturer's false statements to FDA cause the agency to approve a drug or refrain from a post-approval regulatory action that would have affected eligibility for Government payment. Contrary to Defendants' assertion, no formal contractual relationship between the manufacturer and FDA is required to establish such a theory. False Claims Act liability may likewise arise when materially defective drugs are represented and billed to federal healthcare

programs as the FDA-approved product despite actual discrepancies in the drug's identity, purity, quality, or strength from the specifications of the FDA-approved application.

Second, manufacturing deficiencies, including violations of current good manufacturing practice ("cGMP"), may be relevant to certain False Claims Act claims. To be sure, universal cGMP compliance is not a condition of payment. But Medicare Parts A and B, for example, generally exclude payment for drugs that are not safe and effective. Thus, for example, severe manufacturing defects that actually affect the drug's identity, purity, quality, or strength may cause the submission of claims that implicate these program requirements. The same may be true where a manufacturer's misconduct (such as severe and pervasive falsification) conceals material information such that FDA—had it known the truth—would have taken an action leading to the drug's subsequent ineligibility for reimbursement.

Finally, the False Claims Act's *qui tam* provisions do not violate Article II. Relators neither occupy continuing federal offices nor exercise authority reserved to appointed Officers of the United States. They instead litigate as private assignees possessing a personal interest in a particular action. Founding-era practice confirms that the *qui tam* provisions are consistent with Article II.

## LEGAL BACKGROUND

The False Claims Act is "the Government's primary litigative tool" for combatting fraud, and it was intended "to reach all fraudulent attempts to cause the Government to pay out sums of money." S. Rep. No. 99-345, at 2, 9 (1986). Congress therefore drafted the statute "expansively" to reach "all types of fraud, without qualification, that might result in financial loss to the Government." *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (citing *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)). Specifically, the False Claims Act imposes liability on a person who knowingly "presents, or causes to be presented," a false or

fraudulent claim, or knowingly "makes, uses, or causes to be made or used," a false record or statement material to such a claim. 31 U.S.C. § 3729(a)(1)(A)–(B). A "claim" includes qualifying requests or demands for money "whether under a contract or otherwise," *id.* § 3729(b)(2)(A), and "material" means having "a natural tendency to influence, or be capable of influencing," payment, *id.* § 3729(b)(4).

Separately, the Federal Food, Drug, and Cosmetic Act establishes requirements for approving a new drug application and regulating the manufacturing of the drug after approval. A new drug generally cannot enter interstate commerce without an effective FDA-approved application. 21 U.S.C. § 355(a). FDA will approve a new drug application only after determining, among other things, that the new drug is safe and effective for its intended use. *See generally* 21 U.S.C. § 355. A manufacturer seeking approval must provide FDA with significant information, including (i) "full reports of investigations which have been made to show" whether the drug is safe and effective for use, *id.* § 355(b)(1)(A)(i), and (ii) "a full list of the articles used as components of such drug," *id.* § 355(b)(1)(A)(ii). The application must disclose the drug's composition, manufacturing methods, facilities, controls, and proposed labeling. *Id.* § 355(b)(1)(A)(ii)–(vi). FDA will approve the application if it finds that the application contains substantial evidence that the drug is safe and effective for its intended use and no statutory grounds for denial apply. *Id.* § 355(c)–(d).

After approval, FDA has various tools at its disposal to ensure the ongoing safety and efficacy of approved drugs. One such tool is the authority to withdraw approval of a new drug application after notice and opportunity for a hearing to the applicant. FDA will withdraw its approval of a drug when data shows "that [the] drug is unsafe for use" for the approved conditions of use or when new information demonstrates there is no longer sufficient evidence to establish

the drug's safety or efficacy for the approved conditions of use. 21 U.S.C. § 355(e). FDA will also withdraw its approval when it learns that the approved application contained "any untrue statement of a material fact." *Id.*

Further, after obtaining drug approval, manufacturers remain subject to Federal Food, Drug, and Cosmetic Act requirements regarding current good manufacturing practice, often termed "cGMP." *See* 21 U.S.C. § 351(a)(2)(B); 21 C.F.R. pts. 210–211. If FDA finds significant cGMP violations, FDA may undertake various regulatory actions such as issuing a warning letter or requesting that a manufacturer undertake a voluntary recall of affected drug products. *See* FDA, Regulatory Procedures Manual, Ch. 4-1-3 (2024); 21 C.F.R. § 7.40(b). Those voluntary compliance measures operate against the backdrop of compulsory enforcement authority. In certain circumstances, the Government may seek judicial seizure of adulterated or misbranded drugs or an injunction restraining prohibited acts under the Federal Food, Drug, and Cosmetic Act. *See* 21 U.S.C. §§ 332(a), 334(a)(1). FDA may also administratively detain a drug encountered during an inspection when it has reason to believe the drug is adulterated or misbranded. *See id.* § 334(g).

FDA approval is relevant to a number of government healthcare programs. For example, some government agencies directly purchase pharmaceutical products for their own distribution—such as when the Department of Veterans Affairs purchases drugs for use by veterans being treated in the Veterans Affairs healthcare system, or when the Bureau of Prisons purchases drugs that will be administered to federal inmates. In a number of circumstances, FDA approval is a prerequisite for a federal agency to be able to buy the drugs. *See* 38 U.S.C. §§ 7301(b), 8126(a)(1)–(2), (b)(1) (Department of Veterans Affairs procuring covered drugs); 21 U.S.C. § 355(a) ("No person shall

introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application…is effective with respect to such drug.”).

FDA approval is also relevant to several government programs that operate under a reimbursement model. One such program is Medicare, which is administered by the Centers for Medicare and Medicaid Services (“CMS”) within the Department of Health and Human Services. *See* 42 U.S.C. § 1395kk. Another is Medicaid, which is jointly financed by the Federal and State governments and administered by the States. 42 C.F.R. §§ 430.0, 431.10(b)(1); *see also* 42 U.S.C. § 1396a(a)(5). Under these programs, a healthcare provider or supplier—such as a pharmacy, hospital, or physician—furnishes or dispenses a covered drug to a beneficiary and submits a claim for payment. *See, e.g.*, 42 C.F.R. §§ 447.45(b), (d)(1) (Medicaid provider claims); 424.32(a)(1), (b), (d)(2) (Medicare Parts A and B claims); 423.520(a)(1) (Medicare Part D pharmacy claims). Then, the healthcare provider will send a request for reimbursement to a paying entity (such as a state Medicaid agency, a Medicare Administrative Contractor, or a Medicare Part D sponsor). *See, e.g.*, *id.* §§ 447.45(d)(1)–(6), 424.32(a)(1), (d)(2), 423.520(a)(1). For Medicaid and Medicare Part D’s prescription drug benefit for self-administered drugs, statutory provisions generally make FDA approval a precondition for coverage and payment (with certain narrow exceptions). *See* 42 U.S.C. § 1396r-8(k)(2)(A) (Medicaid Drug Rebate Program, defining “covered outpatient drug”); *id.* § 1395w-102(e)(1) (defining covered drugs under Medicare Part D). In most circumstances, FDA approval is a condition for drug reimbursement under Medicare. *See* CMS, Pub. 100-02, Medicare Benefit Policy Manual, ch. 15, § 50.4.1 (Mar. 7, 2024); *International Rehab. Scis. Inc. v. Sebelius,* 688 F.3d 994, 1002 (9th Cir. 2012) (explaining that FDA approval or clearance “is necessary, but not sufficient, for Medicare coverage.”).

## ARGUMENT

### I. Fraud on the FDA May Give Rise to False Claims Act Liability

A viable False Claims Act claim may be premised on materially false or fraudulent statements made to FDA that foreseeably cause subsequent Government payment or reimbursement. For example, reimbursed claims may be false or fraudulent where: (1) material misrepresentations to FDA procured or preserved an approval necessary for reimbursement pursuant to a federal healthcare program; (2) misrepresentations prevented FDA action that otherwise would have materially affected whether the drug qualified for reimbursement pursuant to federal program requirements; or (3) materially defective drugs were represented and billed to federal healthcare programs as the FDA-approved product, despite having actual discrepancies in the drug's identity, purity, quality, or strength from the specifications of the FDA-approved application.[1] Defendants' authorities do not establish a categorical bar to any of these theories.

#### A. False Claims Act Liability Turns on the Causal Connection Between FDA Fraud and Government Payment

As explained above, in deciding whether to pay for a drug, federal healthcare programs often rely on FDA's decision as to whether the drug is safe and effective for its intended use. FDA relies on the information provided by the manufacturer and its compliance with its reporting obligations, including its obligations to report accurate and truthful information, to assess whether drugs marketed in the United States are safe and effective under their approved conditions of use. In turn, the False Claims Act "reach[es] any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, *without regard* to whether that person

[1] In this Statement of Interest, the Government does not set forth all potential fraud on the FDA fact patterns that could give rise to False Claims Act liability, and these examples should not be construed as an exhaustive list.

had direct contractual relations with the government." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45 (1943) (emphasis added). Many courts therefore appropriately focus on the causal connection between the defendant's fraud and Government payment, rather than the particular administrative path through which the fraud operated. *United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 244–45 (3d Cir. 2004) (for a "cause to be presented" claim, the unlawful behavior must be a "substantial factor in bringing about [the] filing" of a false claim and the filing must be "a normal consequence of the situation created by that scheme."); *see also United States ex rel. Feldman v. City of New York,* 808 F. Supp. 2d 641, 650 (S.D.N.Y. 2011) (approving causation standard from *Schmidt*); *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005) ("If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork."). "It is not the distinction between the agencies that matters, but rather the connection between the regulatory omissions and the claim for payment." *United States ex rel. Campie v. Gilead Scis., Inc.,* 862 F.3d 890, 903 (9th Cir. 2017).

Thus, fraud on the FDA may give rise to False Claims Act liability when a manufacturer makes material misrepresentations to FDA relating to a drug's safety or efficacy that are integral to a causal chain leading to the submission of ineligible claims to federal healthcare programs. *See, e.g.*, *Campie,* 862 F.3d at 903 (holding that relators sufficiently alleged falsity under the False Claims Act because defendants "committed either factually false or impliedly false certification through its representations to the FDA and labeling of its products," making those subsequent claims for payment false under the False Claims Act); *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017) ("Because a claim can be false if it does not comply with statutory conditions for payment, the claims at issue here are false if [the drug] was not 'reasonable

and necessary.' [ ] One important factor considered by the Centers for Medicare and Medicaid Services (CMS) to determine whether a prescribed drug is 'reasonable and necessary' is whether it has received FDA approval."). Pursuant to its mandates, FDA may take action that affects whether a drug is prescribed or distributed. Misrepresentations made after approval may therefore support False Claims Act liability where they cause FDA to refrain from a regulatory action that would have affected whether resulting claims were false or eligible for Government payment.

A separate False Claims Act theory may also arise where a manufacturer causes the submission of claims for materially defective drugs that are represented as the FDA-approved product. *See United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 31 (1st Cir. 2017) (sustaining False Claims Act allegations where the manufacturer had "palmed off latently defective versions of its FDA-approved product" as the approved device). Whether Relator has sufficiently pleaded any such theory is beyond the scope of this Statement of Interest.

**B. Defendants' Authorities Do Not Establish a Categorical Bar to False Claims Act Liability for Fraud on the FDA**

Authorities cited in Defendants' briefs, *see, e.g.*, Tris Br. 9–13, do not establish that FDA approval defeats a False Claims Act claim even where material misrepresentations to FDA allegedly procured or preserved that approval. For example, in *D'Agostino v. ev3, Inc.,* the First Circuit rejected a relator's claims on the basis that the relator did not plausibly allege that the asserted misrepresentations had any effect on FDA's approval decision. *D'Agostino v. ev3, Inc.*, 845 F.3d 1, 8 (1st Cir. 2016). But the First Circuit expressly declined to hold that liability could not exist where fraudulent representations "actually caused [FDA] to approve or clear the device." *Id.* at 9. Nor did the court address a theory based on material misrepresentations made after approval that caused FDA to refrain from taking post-approval regulatory action it otherwise would have taken. *D'Agostino* therefore simply rejected an inadequately pleaded causal theory.

*Nargol* likewise does not support any categorical rule. The relators' FDA-fraud theory failed because their allegations undermined the premise that the asserted falsities had procured or preserved FDA approval. They alleged that FDA had learned of their concerns but had neither withdrawn nor questioned its approval. *Nargol,* 865 F.3d at 34–35. The First Circuit therefore found it implausible to infer any actual effect of the alleged falsehoods on FDA's decision. *Id.* Indeed, the court emphasized that FDA had been informed of the relators' concerns yet allowed the device to remain on the market and took no further regulatory action. *Id.* at 35–36. That fact-specific holding does not foreclose a case in which facts are adequately pleaded.

The Second Circuit's recent summary order in *United States ex rel. Wood v. Siemens Medical Solutions USA, Inc.*, No. 25-864, 2026 WL 504530 (2d Cir. Feb. 24, 2026), is also consistent with the Government's position. In *Siemens*, the Second Circuit did not reject a fraud on the FDA theory as a matter of law. It affirmed dismissal under Rule 9(b) where the relator alleged that Siemens's shipping containers did not maintain in vitro diagnostic devices at required temperatures "in certain weather conditions," but failed to identify a single device that was actually rendered unreliable as a result. *Id.* at *2–3. The court emphasized that the relator identified no specific defective shipment and "simply speculate[d] that some [devices] shipped to the government *may* have become unreliable." *Id.* (emphasis added).

Finally, *United States ex rel. Yu v. Grifols USA, LLC* does not establish that fraud on the FDA can support False Claims Act liability only when it induces a government contract. No. 17 Civ. 2226 (GHW), 2021 WL 5827047 (S.D.N.Y. Dec. 8, 2021) ("*Grifols I*"), *aff'd on other grounds*, No. 22-107, 2022 WL 7785044 (2d Cir. Oct. 14, 2022) ("*Grifols II*") (summary order). In *Grifols I*, Judge Woods held that the relator had not adequately pleaded that alleged cGMP violations were material to government reimbursement. The relator did not allege that the

violations had actually affected the drug's quality, but instead alleged only that they "may" or "could" have adverse consequences. *Id.* at *9–10. To be sure, Judge Woods separately cast doubt on whether a "fraudulent inducement theory is applicable to cases where the parties did not enter into a contract." *Id.* at *10. But notably, the relator's complaint in *Grifols I* had not adequately alleged that the asserted violations actually impaired the drug's quality, safety, or efficacy, and the relator's opposition did not rely on FDA approval as the basis for his fraudulent-inducement theory. *Id.* at *9–11 & n.6. The court therefore had no occasion to decide whether materially false statements that actually procured or preserved FDA approval—and thereby caused federal programs to reimburse claims that otherwise would have been ineligible—may give rise to False Claims Act liability. As set forth above, the weight of authority supports the availability of such a theory regardless of whether it bears the "fraudulent inducement" label. *See id.* at *10.

To the extent that *Grifols I* could be read to hold that the existence of a formal contractual relationship between the manufacturer and FDA is required to establish such a theory—as Defendants argue—the Government respectfully submits that such a holding is mistaken. The Supreme Court has rejected the proposition that there can be no False Claims Act claim where there is no "direct contractual relationship between the [contractors] and the United States[.]" *Hess*, 317 U.S. at 544-45. Several courts of appeals have likewise recognized fraudulent-inducement claims where antecedent false statements secured eligibility for a federal benefit program and later claims for federal payment followed. For example, the Seventh Circuit recognized a fraudulent inducement claim based on false statements that a university made to secure eligibility for federal funding; once eligibility was established, the defendant worked with students to apply for (and receive) federal grants, loans, and scholarships that would not have been disbursed had the university been truthful. *Main*, 426 F.3d at 916. As the Seventh Circuit correctly observed, the

False Claims Act "requires a *causal* rather than a temporal connection between fraud and payment." *Id.* (emphasis added). The Ninth Circuit has similarly recognized a fraudulent inducement claim where the defendant university made false promises to secure eligibility for federal funding—after which the defendant requested federal payment directly from Pell Grant funds or indirectly through government-insured loans. *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1177 (9th Cir. 2006). And at least one court in this Circuit has applied fraudulent-inducement principles where the government action allegedly procured was program enrollment, rather than a contract with the approving agency. In *United States ex rel. Forcier v. Computer Sciences Corp.*, the Government alleged that the defendant induced Medicaid to approve its enrollment as a billing agent through a misleading enrollment application. No. 12 Civ. 1750 (DAB), 2017 WL 3616665, at *10–12 (S.D.N.Y. Aug. 10, 2017). Although the case involved the concealment of a separate contractual arrangement between the defendant and New York City, the action wrongfully induced by the defendants was Medicaid enrollment approval. The court sustained the fraudulent-inducement claim and explained that a party may be pursued under that theory when it "used deception to receive an entitlement that [it] otherwise would not have." *Id.* at *13 n.8. These cases demonstrate that fraudulent-inducement principles are not confined to traditional procurement contracts.[2]

The same principle applies when regulatory approval secures eligibility for federal reimbursement for a drug. A manufacturer may, for example, cause false claims by fraudulently procuring or preserving approval needed for federal programs to pay for its drug. *See Campie*, 862 F.3d at 902, 905 (recognizing that a fraud on the FDA could fall within the "promissory fraud" or

[2] The Second Circuit's recognition that False Claims Act liability may attach under a fraudulent inducement theory when a contract is procured by fraud, *United States v. Strock*, 982 F.3d 51, 60 (2d Cir. 2020), does not limit that theory only to the context of contracts.

"fraud-in-the-inducement" theories of liability under the False Claims Act). The fact that the fraud operated through FDA approval, rather than through a false statement made directly to the paying agency, does not preclude liability where the fraud caused federal programs to pay claims. *See United States ex rel. Feldman*, 808 F. Supp. 2d at 650 (finding a sufficiently direct causal chain although one entity rendered claims false and another submitted them); *Main*, 426 F.3d at 916 ("If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork."); *cf. Universal Health Services, Inc. v. United States ex rel. Escobar,* 579 U.S. 176, 181 (2016) ("What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision"). A contrary holding would improperly restrict False Claims Act liability in a wide variety of noncontractual benefit programs.

## II. cGMP Violations May Be Relevant to False Claims Act Liability When They Cause Material Product Defects

Manufacturing deficiencies, including violations of cGMP requirements, may be relevant in certain False Claims Act cases. For example, such deficiencies may be relevant where they are sufficiently serious to give rise to actual discrepancies in the composition, functioning, safety, or efficacy of the affected product. This may occur when the affected product's identity, purity, quality, or strength materially differs from what was specified to and approved by FDA. *See* 21 U.S.C. § 351(a)(2)(B), (b)–(d); 21 C.F.R. §§ 314.50(d)(1), 314.70. Manufacturing deficiencies may degrade a product's quality, safety, or efficacy so substantially that FDA would have taken material regulatory action had the agency known the truth. In other instances, falsification of relevant testing data that would have revealed discrepancies in the identity, purity, quality, or strength of the affected product, may cause FDA to refrain from a material regulatory

action it would have otherwise taken, had the agency known the truth. *Cf. Campie*, 862 F.3d at 897–900, 903–04 (considering allegations concerning data integrity, concealed use of unapproved and contaminated active ingredients, and false information provided to FDA).

Courts have recognized that manufacturing deficiencies may be relevant to federal healthcare program eligibility requirements. For example, in *United States v. Marshall Medical Center*, the relator alleged that defendants administered and billed for expired and contaminated chemotherapy drugs. No. 12 Civ. 00098 (JAM) (KJN), 2015 WL 2235461, at *10–12 (E.D. Cal. May 12, 2015). The court held that the allegations stated a False Claims Act claim because unsafe drugs were not "reasonable and necessary" under Medicare. *Id.* at *11–12. Likewise, in the context of medical testing, the Second Circuit has observed that "the requisite level of medical necessity may not be met" when a procedure is "deleterious." *Mikes v. Straus*, 274 F.3d 687, 698 (2d Cir. 2001), *abrogated in part on other grounds by Escobar*, 579 U.S. at 190.

Defendants cite to decisions holding that adulteration, misbranding, or other violations of FDA requirements do not, by themselves, establish falsity. Those decisions establish that regulatory noncompliance standing alone does not make a reimbursement claim false; they do not establish that manufacturing deficiencies are irrelevant where adequately pleaded facts show that the deficiencies actually affected the product's eligibility for payment. The Fourth Circuit's decision in *United States ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694 (4th Cir. 2014), illustrates only this narrow point. *See* Tris Br. 17. There, the court rejected a theory of liability "based merely on a regulatory violation," where the relator had not identified any false statement or other fraudulent misrepresentation made to the Government. *Rostholder*, 745 F.3d at 701–02. The court cautioned that accepting such a theory would turn the False Claims Act into "a sweeping mechanism to promote regulatory compliance." *Id.* at 702. Because the asserted falsity in

*Rostholder* rested on regulatory violations alone, the court did not address whether claims may be fraudulent because material falsehoods actually procured or preserved the approval necessary for reimbursement.

*United States ex rel. Powell v. Medtronic, Inc.* and *United States ex rel. Crocano v. Trividia Health Inc.* are similarly limited. In *Medtronic*, Judge Failla concluded that the relator had not adequately alleged adulteration and observed that adulteration "without more" did not clearly render a reimbursement claim false. No. 18 Civ. 1628 (KPF), 2024 WL 4165522, at *12–13 (S.D.N.Y. Sept. 12, 2024). As to a separate theory based on misleading representations concerning reuse of the devices, the court assumed that falsity had been adequately alleged and dismissed on the independent ground that materiality was deficient. *Id.* at *14. Similarly, the court in *Crocano* concluded that allegations of manipulated testing, concealment, misbranding, and adulteration did not adequately identify a false claim or payment-related statement or otherwise connect the alleged regulatory violations to falsity. 615 F. Supp. 3d 1296, 1309–12 (S.D. Fla. 2022). Neither decision adopts any categorical bar.

The Second Circuit's summary order in *Grifols II* also does not support Defendants' contention that cGMP-related misrepresentations are immaterial whenever cGMP compliance is not identified as an express condition of payment. In *Grifols II*, the Second Circuit emphasized the relator's "fail[ure] to identify the particular [cGMP] violations that led to any adverse impact on [the drug]'s quality with enough specificity." 2022 WL 7785044, at *3-5. It also noted that the relator's theory rested on the proposition that "manufacturing processes must comply with all applicable cGMPs." *Id.* The Second Circuit did not confront adequately pleaded allegations identifying particular manufacturing deficiencies that actually affected a drug's quality, safety, or

efficacy. Nor did it confront allegations that deficiencies or falsification, if known to FDA, would have led the agency to take action resulting in removal of the drug or affected lots from the market.

## III. The False Claims Act's *Qui Tam* Provisions Are Consistent With Article II

Defendants contend that the False Claims Act's *qui tam* provisions violate Article II because relators are not appointed in the manner prescribed by the Appointments Clause. *See* Tris Br. 20; Pfizer Br. 24–25. Every court of appeals to address the constitutionality of the Act's *qui tam* provisions has upheld them. *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804–07 (10th Cir. 2002), *rev'd on other grounds*, 549 U.S. 457 (2007); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753–58 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1040–42 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 749–59 (9th Cir. 1993), cert. denied 510, U.S. 1140 (1994). And virtually every district court to consider constitutional challenges to the False Claims Act's *qui tam* provisions has likewise rejected them. *See, e.g.*, *United States ex rel. Souza v. Embrace Home Loans, Inc.*, 808 F. Supp. 3d 314 (D.R.I. 2025); *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 808 F. Supp. 3d 917, 935 (E.D. Wis. 2025); *United States ex rel. McCullough v. Anthem Ins. Cos., Inc.*, No. 1:21-cv-00325-TWP-TAB, 2025 WL 2782576, at *15–16 (S.D. Ind. Sept. 30, 2025); *United States ex rel. Travis v. Gilead Scis., Inc.*, No. 17-1183, 2025 WL 2627686, at *7–8 (E.D. Pa. Sept. 11, 2025); *United States ex rel. Proctor v. Wound Care Mgmt., LLC*, No. 18-4234, 2025 WL 2444133, at *2–3 (E.D. La. Aug. 25, 2025); *United States ex rel. Gomez v. Koman Constr., LLC*, 796 F. Supp. 3d 353 (W.D. Tex. 2025); *United States ex rel. Butler v. Shikara*, 748 F. Supp. 3d 1277, 1294–97 (S.D. Fla. 2024); *United States ex rel. Deligdish v. N. Brevard Cnty. Hosp. Dist.*, No. 6:22-cv-696-JSS-DCI, 2025 WL 2217710, at *12 (M.D. Fla. Aug. 5, 2025); *United States ex rel. Shahbabian v. Trihealth, Inc.*, No. 1:20-cv-67, 2025 WL 2108197, at *3–8 (S.D. Ohio July 28, 2025) (rejecting constitutional challenge but certifying for interlocutory appeal); *United States ex*

*rel. Taylor v. Healthcare Assocs. of Texas, LLC*, No. 3:19-CV-02486-N, 2025 WL 1885642, at *6 (N.D. Tex. July 8, 2025); *United States ex rel. Stenson v. Radiology Ltd., LLC*, No. CV-19-00306-TUC-JGZ, 2025 WL 1785266, at *2 (D. Ariz. June 27, 2025); *United States ex rel. Publix Lit. P'ship, LLP*, No. 8:22-cv-2361 (TPB) (AAS), 2025 WL 1381993, at *3 (M.D. Fla. May 13, 2025); *United States ex rel. Adler v. Sporn Co. Inc.*, No. 2:24-cv-00617, 2025 WL 1371272, at *16–17 (D. Vt. May 12, 2025); *United States ex rel. Kenley Emergency Med. v. Schumacher Grp. of Louisiana Inc.*, No. 20-cv-03274-SI, 2025 WL 1359065, at *5 (N.D. Cal. May 9, 2025); *United States ex rel. Gonite v. United Healthcare of Georgia, Inc.*, 785 F. Supp. 3d 1325, (M.D. Ga. 2025); *United States ex rel. Penelow v. Janssen Prods., LP*, No. CV 12-7758 (ZNQ) (JBD), 2025 WL 937504, at *12 (D.N.J. Mar. 28, 2025); *United States ex rel. Resolution NJ LLC v. Riverside Med. Grp., P.C.*, No. 2:22-cv-4165, 2024 WL 4100372, at *5 (D.N.J. Sept. 6, 2024); *United States ex rel. CLJ, LLC v. Halickman*, No. 20-CV-80645, 2024 WL 3332055, at *21 n.5 (S.D. Fla. June 14, 2024); *United States ex rel. Wallace v. Exactech, Inc.*, 703 F. Supp. 3d 1356 (N.D. Ala. 2023); *United States ex rel. Thomas v. Mercy Care*, 2023 WL 7413669, at *4 (D. Ariz. Nov. 9, 2023); *United States ex rel. Miller v. ManPow*, No. 2:21-cv-05418 (VAP) (ADS), 2023 WL 8290402, at *3–5 (C.D. Cal. Aug. 30, 2023); *United States ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1278–79 (M.D. Fla. 2014); *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F. Supp. 2d 1201, 1212 (M.D. Fla. 1999); *but see United States ex rel. Gose v. Native Am. Servs. Corp.*, No. 8:16-cv-03411, 2025 WL 1531137 (M.D. Fla. May 29, 2025) (Mizelle, J.); *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024) (Mizelle, J.).[3] The Second Circuit has likewise explained that the Act's *qui tam*

[3] Appeals of Judge Mizelle's rulings in *Gose* and *Zafirov* are pending before the Eleventh Circuit (Nos. 25-12009, 25-12149, 24-13581, 24-13583).

provisions "do not usurp the executive branch's litigating function." *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155 (2d Cir. 1993), cert denied, 588 U.S. 973 (1993).

Defendants' challenge fails for two reasons. First, relators are not Officers of the United States: they do not occupy continuing federal positions, and the Act treats them as private assignees rather than Executive Branch officers or presidential subordinates. Second, Founding-era *qui tam* practice confirms that relators need not be appointed under the Appointments Clause.

### A. Relators Need Not Be Appointed in the Manner Prescribed by the Appointments Clause

The Appointments Clause prescribes the means of appointing "Officers of the United States" to public offices "established by Law." U.S. Const. art. II, § 2, cl. 2. In support of their argument, Defendants cite to only one district court case that has held that the *qui tam* provisions are unconstitutional, *Zafirov v. Fla. Medical Associates, LLC*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024). In *Zafirov*, the district court concluded that relators under the False Claims Act are officers of the United States, such that they must be appointed in a manner consistent with the Appointments Clause, because, in the court's view, they "possess[] civil enforcement authority on behalf of the United States" and "occup[y] a continuing position" established by law. 751 F. Supp. 3d at 1307. This reasoning is mistaken. Relators possess none of the indicia of officeholders within the meaning of the Appointments Clause: Their roles are limited in time and scope, confined to a particular case, and fundamentally personal in nature.

#### 1. Relators Do Not Occupy Continuing Positions

To be an "Officer of the United States" subject to the Appointments Clause, a person "must occupy a 'continuing' position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quoting *United States v. Germaine*, 99 U.S. 508, 511 (1878)). An office is continuing when its

"duties continue, though the person" occupying it may "be changed." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (Marshall, C.J.). A relator's role—limited in time and scope rather than continuing from officeholder to officeholder—does not meet that test. *See* 31 U.S.C. § 3730(b)(5).

In *Zafirov*, the district court analogized relators to independent counsel or bank receivers, *see* 751 F. Supp. 3d at 1315, that have been found to be officers, *see Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988) (independent counsel); *United States v. Weitzel*, 246 U.S. 533, 541 (1918) (bank receiver); *see also United States v. Donziger*, 38 F.4th 290 (2d Cir. 2022) (special prosecutor). But those positions were continuing because their duties survived a change in personnel: Alexia Morrison was appointed to replace an earlier independent counsel who had resigned, *Morrison*, 487 U.S. at 667, while *Stanton v. Wilkeson*, another bank receiver case, explained that "[v]acation of office by the comptroller" would not "vacate the receivership," 22 F. Cas. 1074, 1074–75 (S.D.N.Y. 1876). And in *Donziger*, the Second Circuit, citing *Maurice*, specifically based its ruling on the premise that "the individuals appointed as special prosecutors could be replaced without the duties of the positions terminating." 38 F.4th at 297.

A relator's role is different. The duty at issue is prosecuting a particular qui tam action, and that duty cannot pass to a successor relator. If a particular relator who has filed a *qui tam* action decides she is no longer interested in pursuing the action, another person cannot simply take her place as relator. Once a relator brings suit, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).

The district court in *Zafirov* reasoned that a relator's role is continuing because any person who satisfies the statutory prerequisites may become a relator. *See* 751 F. Supp. 3d at 1316. But the question is not whether many people may serve as relators in different cases; it is whether the

duties of a particular position continue from one officeholder to the next. The litigation duty in a particular *qui tam* action is personal to that relator and cannot be transferred to another. Nor does it matter that an individual can serve as a relator in a particular *qui tam* case for years; that too is irrelevant to whether a role is continuing in the relevant sense—*i.e.*, whether the duties of the role can be passed from one person who occupies the role to the next.

Accordingly, because a relator's case-specific role neither survives a change in personnel nor exists independently of the particular action, a relator does not occupy a "continuing" position subject to the Appointments Clause.

**2. Relators Are Private Assignees, Not Executive Officers**

Relators are also not officeholders subject to the Appointments Clause because Congress envisioned their roles as fundamentally personal rather than governmental in nature. In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, the Supreme Court held that *qui tam* relators have Article III standing to sue under the False Claims Act on the ground that the Act "can reasonably be regarded as effecting a partial assignment of the Government's damages claim" by entitling the relator to a share of any ultimate recovery. 529 U.S. 765, 773 (2000); *see United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 425 (2023) (same). The Court has also expressly rejected the theory that relators sue as agents of the United States, *Stevens*, 529 U.S. at 772, and described *qui tam* actions as "private suit[s]" brought by "private parties." *Id.* at 780 n.9, 786 n.17.

Although *Stevens* expressly reserved the Article II question, *id.* at 778 n.8, its holding identifies the legal capacity in which a relator sues: as a private assignee possessing a personal Article III injury, not as an agent appointed to occupy a federal office. In authorizing *qui tam* suits, Congress did not create a federal office. Rather, Congress was authorizing relators to pursue a personal monetary recovery—employing "the theory, based on experience as old as modern

civilization, that one of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetrators of them liable to actions by private persons acting … under … the hope of gain." *United States v. Griswold*, 24 F. 361, 366 (D. Or. 1885) (quoted in *Hess*, 317 U.S. at 541 n.5, and in *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997)).

That a relator brings a *qui tam* suit "in the name of the Government," 31 U.S.C. § 3730(b)(1), does not transform a relator into an officer. *Cochise Consultancy, Inc. v. United States ex rel. Hunt* explained that the statutory provision for *qui tam* actions "does not make the relator anything other than a private person" as opposed to an "official of the United States." 587 U.S. 262, 272 (2019); *see also, e.g.*, *Taxpayers Against Fraud*, 41 F.3d at 1041 ("Although a relator may sue in the government's name, the relator is not vested with governmental power.").

The fact that relators decide whether to commence litigation by filing a *qui tam* complaint likewise does not make them governmental officeholders. A *qui tam* action cannot proceed or be unsealed until the Government decides whether to intervene and proceed with the action, intervene and seek dismissal, or decline to intervene and allow the relator to conduct the action subject to the Government's ongoing oversight. 31 U.S.C. § 3730(b)(2)-(4). That structure makes clear that relators do not act as Government officials when they bring suit. Pfizer is therefore wrong to characterize declination as "ceding enforcement authority to Relator without DOJ oversight." Pfizer Br. 25. Declination permits the relator to conduct the action; it does not extinguish the Government's continuing statutory authority.

Relators therefore do not occupy continuing federal positions and act as private assignees rather than federal officers. They do not fall within the ambit of the Appointments Clause.

**B. Qui Tam Suits Have Historically Been Viewed as Constitutionally Permissible and Do Not Violate the Vesting or Take Care Clauses**

The Vesting and Take Care Clauses state that "[t]he executive power shall be vested in a President of the United States" and that the President "shall take care that the laws be faithfully executed." U.S. Const. art. II, §§ 1, 3. Defendants contend that relators exercise executive power in a manner inconsistent with these Clauses, *see* Tris Br. at 20; Pfizer Br. at 24, but this Court should reject that argument too.

First, Defendants cite no authority supporting this proposition. *Zafirov*, for example, did not address these legal issues. Further, the Supreme Court has repeatedly recognized *qui tam* provisions as common and legitimate. In *Marvin v. Trout*, 199 U.S. 212 (1905), the Supreme Court commented, while upholding the constitutionality of a state *qui tam* provision, that to reach a contrary conclusion "would be in effect to hold invalid all legislation providing for proceedings in the nature of *qui tam* actions," even though (as noted above) such statutes had "been in existence for hundreds of years in England, and in this country ever since the foundation of our government." *Id.* at 225. And in *Hess*, the Supreme Court found that a court of appeals construing the False Claims Act narrowly "on the premise that *qui tam* or informer actions 'have always been regarded with disfavor'" was wrong to do so because "[*q*]*ui tam* suits have been frequently permitted by legislative action" and "Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it." 317 U.S. at 540-42. The historical record thus suggests that all three branches of the early American government accepted *qui tam* statutes as an established feature of the legal system.

Further, the False Claims Act's *qui tam* provisions provide greater means for governmental control than the early *qui tam* statutes did. The Government performs an upfront review before a *qui tam* action can proceed, or even be unsealed. *See* 31 U.S.C. § 3730(b)(2)-(4). Even if the

government initially declines to intervene, it may still intervene at a later time for good cause. *See* 31 U.S.C. § 3730(c)(3). And the Government may move to dismiss a False Claims Act action over a relator's objection, subject to highly deferential review under Federal Rule of Civil Procedure 41(a). *Id.* § 3730(c)(2)(A). The Supreme Court has emphasized that district courts should grant dismissal "in all but the most exceptional cases … even if the relator presents a credible assessment to the contrary." *Polansky*, 599 U.S. at 437-38. The Government may also settle a pending suit over the objections of the relator, *see* 31 U.S.C. § 3730(c)(2)(B); and veto a relator's proposed settlement or voluntary dismissal of his action, *id.* § 3730(b)(1). The United States may also stay any discovery by the relator that "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts," *id.* § 3730(c)(4). If early *qui tam* statutes, which lacked such controls, were understood to pose no Article II problem, then the False Claims Act's *qui tam* provisions cannot be understood to pose any Article II problem either.

In addition, there is an extensive body of evidence that *qui tam* provisions have, since the founding, been understood as established features of American law. Statutes authorizing common informers to sue "have been in existence for hundreds of years in England, and in this country ever since the foundation of our government." *Hess*, 317 U.S. at 541 n.4 (quoting *Marvin v. Trout*, 199 U.S. 212, 225 (1905)). *Stevens* likewise identified a "long tradition of *qui tam* actions in England and the American Colonies," and a "considerable number" of statutes with *qui tam* provisions passed by the First Congress. 529 U.S. at 774–77. The Supreme Court found this body of history about the historical roots of *qui tam* provisions "well nigh conclusive" in the Article III context, *id.* at 777, and it is just as "conclusive with respect to the Article II question" raised here. *Riley*, 252 F.3d at 752; *see Stevens*, 529 U.S. at 801 (Stevens, J., dissenting); *United States ex rel. Butler*

*v. Shikara*, 748 F. Supp. 3d 1277, 1295 (S.D. Fla. 2024) ("[D]ecades—nay, centuries—of litigation through the use of the *qui tam* device under the [False Claims Act] undercuts [defendant's] argument" against the constitutionality of the False Claims Act's *qui tam* provisions).

This is because enactments of the First Congress are "contemporaneous and weighty evidence" of the Constitution's "true meaning." *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) (quoting *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888)); *see also Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n*, 601 U.S. 416, 432 (2024) (same); *Bowsher v. Synar*, 478 U.S. 714, 723 (1986) (same). In *Trump v. Slaughter*, No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026), a recent decision concerning the President's authority to remove a Senate-confirmed FTC Commissioner from an acknowledged federal office, the Court confirmed that this Founding-era evidence bears directly on Article II questions. In leaving open whether functions traditionally handled outside the Executive Branch fall beyond *Myers*'s general rule of presidential removal authority, the Court noted that *Myers* placed "the greatest weight" on the early Congresses' and Presidents' "'contemporaneous legislative exposition' of the Executive's constitutional role." *Id.* at *18 (quoting *Myers v. United States*, 272 U.S. 52, 174–75 (1926)). *Trump v. Cook* illustrates how that historically grounded inquiry operates—although the Federal Reserve differs from the First and Second Banks, the Court upheld its removal protection because the modern institution remained "consistent with the principles that underpin" that Founding-era tradition and preserved the balance struck by the founding generation under modern circumstances. No. 25A312, 2026 WL 1855613, at *14 (U.S. June 29, 2026) (quoting *United States v. Rahimi*, 602 U.S. 680, 692 (2024)).

History shows that *qui tam* provisions are consistent with the original understanding of Article II. The First Congress enacted "a considerable number of" *qui tam* provisions, including

those allowing private persons to sue for a share of penalties for failures to file census returns, unlawful treatment of seamen, and unlicensed trading with Indian tribes. *Stevens*, 529 U.S. at 776–77 & n.6 (citing Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. at 102; Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. at 131, 133; Act of July 22, 1790, ch. 33, § 3, 1 Stat. at 137–138). Their enactment immediately after the Founding is strong evidence that *qui tam* statutes comport with Article II.

The Executive Branch likewise recognized qui tam litigation as an established feature of American law when the Attorney General included, in draft legislation in 1795, a cost-shifting provision for qui tam suits. See 1 William S. Hein & Co., American State Papers, Class X, Miscellaneous 117, 121 (1998) (provision for cost-shifting in suits brought by "any informer or plaintiff, on a penal statute, to whose benefit the penalty, or any part thereof, if recovered, is directed by law to accrue"), https://perma.cc/JGR5-8AQA (last visited July 31, 2026). This suggests that the early Executive Branch also perceived no constitutional problem with qui tam suits.

The historical context of the False Claims Act's *qui tam* provisions confirms that they are consistent with the original understanding of Article II.

## CONCLUSION

For the foregoing reasons, the Court should reject Defendants' Article II challenge and resolve the motions to dismiss consistent with the legal principles set forth in this Statement of Interest.

Dated: New York, New York
July 31, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
*Attorney for the United States of America*

By: */s/ Jeremy M. Liss*
JEREMY M. LISS
ERICA SILVERMAN
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2795/2696
E-mail: Jeremy.Liss@usdoj.gov
Erica.Silverman@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 7,756 words.